GEFFERT, Appellant, vs. KAYSER and another, Respondents.

*January 12—February 6, 1923.*

*Automobiles: Liability of father for negligence of son: Nonsuit: Construction to be given evidence: Question for jury: Striking pedestrian while on street crossing: Contributory negligence.*

1. Where the defendant son was using his father's automobile for the purpose of taking a young lady to a dance, he was not engaged in the business of the father, and the latter is not liable to a pedestrian who is struck by the automobile. *Crossett v. Goelzer,* 177 Wis. 455, followed.
2. On a motion for nonsuit plaintiff's evidence must be given the most favorable construction it will bear in his favor, and if there is credible evidence from which a reasonable inference can be drawn in support of his case it must be left to the jury. Not only must the facts be undisputed, but, if conflicting inferences can be drawn, it is for the jury to draw them if the question is not one of law.
3. Although there was no direct evidence that defendant was driving in excess of fifteen miles an hour, where he testified that he did not apply his brakes as he approached a street crossing, that he saw a group on the crossing while he was 150 feet away, and that he could have stopped his car within a distance of twenty feet, and the evidence is definite that after striking the plaintiff the car ran forty feet, the question of his negligence is for the jury.
4. The evidence in this case being such that the minds of reasonable men might come to different conclusions on the question of plaintiff's negligence, the question was for the jury.

VINJE, C. J., and ESCHWEILER and JONES, JJ., dissent.

APPEAL from a judgment of the superior court of Dane county: AUGUST C. HOPPMANN, Judge. *Affirmed as to one defendant; reversed as to the other.*

Personal injury. Two actions were begun, one by *Clara Geffert,* the wife, and one by *Louis A. Geffert,* the husband, against the defendants. Upon the opening of the trial there was a motion to consolidate the two causes, which was granted, and they were tried as one case and will be so treated here.

The case was tried to the court and jury, and at the close of plaintiffs' evidence there was a motion on behalf of the defendant *Adolph H. Kayser* that the plaintiffs be nonsuited on the grounds, first, that the testimony failed to show any negligence on the part of *Paul Kayser;* second, that the testimony affirmatively disclosed contributory negligence on the part of the plaintiff *Clara Geffert;* and third, that the testimony failed to show any relationship of agency or otherwise between the defendant *Adolph H. Kayser* and his son, *Paul Kayser,* which would make *Adolph H. Kayser* liable for the acts of *Paul Kayser.* The defendant *Paul Kayser* moved for a nonsuit on the first two grounds above mentioned. The trial court granted the motion of each defendant, judgment of nonsuit was entered, and from that judgment the plaintiffs appeal. The facts will be stated in the opinion.

For the appellants there was a brief by *J. T. Dithmar* and *R. P. Clark,* both of Elroy, and oral argument by *Mr. Dithmar.*

For the respondents there was a brief by *Buell & Lucas* and *Olin, Butler, Thomas, Stebbins & Stroud,* all of Madison, and oral argument by *Byron H. Stebbins* and *C. E. Buell.*

ROSENBERRY, J. We will first consider the liability of the defendant *Adolph H. Kayser.* It appears without dispute that the automobile, which was at the time of the accident being driven by *Paul Kayser,* was owned by *Adolph H. Kayser.* It further clearly appears that *Paul Kayser* had procured his father's permission to take the car for the purpose of taking a young lady to a dance, and that he was on his way from his father's home to the residence where he was to call for her at the time the accident occurred. It is claimed that going to the dance was part of the education of *Paul Kayser,* who at the time was a student; that

he was therefore engaged in the business of his father; and other similar contentions are urged. Every contention made here by the plaintiffs as to the liability of the defendant *Adolph H. Kayser* was fully considered in *Crossett v. Goelzer*, 177 Wis. 455, 188 N. W. 627, and was there ruled adversely to plaintiffs. The judgment of nonsuit as to *Adolph H. Kayser* is correct, and we shall not further consider the matter of his liability.

This leaves for consideration two questions: first, Was there an entire want of evidence of negligence tending to show that the defendant *Paul Kayser* was negligent? second, Was there evidence which conclusively established that the plaintiff's negligence contributed to produce the injury complained of?

In this connection it is elementary that upon a motion for a nonsuit plaintiffs' evidence must be given the most favorable construction which it will bear in their favor, and if there is credible evidence from which a reasonable inference can be drawn in support of the plaintiffs' case, the question must be left to a jury. *Mahar v. Montello G. Co.* 146 Wis. 46, 130 N. W. 949.

Not only must the facts be undisputed, but if conflicting inferences can be drawn therefrom, it is within the province of the jury to draw the inferences, if the question is not one of law.

For brevity and convenience the word "defendant" in this opinion will hereafter be used as referring to *Paul Kayser*.

The evidence will be more clearly understood by reference to the accompanying diagram, which is a reproduction on a smaller scale of Exhibit No. 1. Gorham street runs northeast and southwest. Blair street runs northwest and southeast. The accident occurred between the curb lines of Gorham street, where the sidewalk on the northeasterly side of Blair street crosses Gorham street. Both streets are sixty-six feet wide. Both Blair and East Gorham

streets are thirty-two feet wide between the curbs; on each side of each street between the curb and lot line

there is a terrace and sidewalk, taking up seventeen feet. East Gorham street is a smooth, hard-surface street, upon which there is much automobile traffic. The crosswalk

is of brick and about four feet wide, covered with a tar surfacing, having the same general appearance as the roadway.   On each end of the crosswalk is an iron plate or apron about five feet four inches long and two feet wide, which bridges the gutter.

On the 23d day of July, 1920, plaintiffs resided on the northeasterly side of Blair street, at No. 319, about forty-six feet distant in a southeasterly direction from the southeasterly side of Gorham street.   The defendant resided at the intersection of East Gorham street and North Livingston street, two blocks distant, in a northeasterly direction. On the evening of July 23, 1920, there was being held on Lake Mendota a water carnival, known as a Venetian Night.   Between 8:30 and 9 o'clock the plaintiff *Clara Geffert,* accompanied by Mrs. Alma Heim, who was wheeling a baby in a go-cart, Mr. Louis Kurth, his wife, Lottie Kurth, and their child about ten years of age, left the Geffert home, traveling on the northeasterly side of Blair street to go northwesterly along the northeast side of Blair street to Lake Mendota.   This would require them to cross Gorham street on the northeasterly side of Blair street. The party walked in the following order: Mr. Kurth led with his child by the hand, following him came *Mrs. Geffert,* then came the go-cart with the baby, and behind the go-cart followed Mrs. Heim and Mrs. Kurth.   Up to this point there is no conflict.

*Mrs. Geffert* testified that she looked east and west to see if the crossing was perfectly clear before starting, meaning that she looked up and down East Gorham street to the right and to the left.

"We started across, it was perfectly clear.   I took a good observation of the crossing, and I am given to the habit of observing crossings.   And as I went across, I observed the crossing of the street to see if anything was coming.   I first saw the car about half way up the block, up by Mr. Meltzer's house, would be as near as I can state.   When I

saw the car near Mr. Meltzer's house, I was just this side of half of the street towards my home. I was about a foot this side towards my home. I was about a foot east of the center. In front of Mr. Meltzer's house I saw a car. It was coming at good speed, coming right down the incline. I next saw the car when it was right next to me, right under this arm. It just seemed as if it was right under the right arm. The bumper struck me on my left hip. The car struck me about a foot before the center. The car carried me some distance. It threw me because I rolled. At the time I was struck by the car, Mr. Kurth and his daughter were on the corner. They were across."

She further testified that at the time she saw the car in front of Mr. Meltzer's home the car had two lights upon it, lighted. She further testified:

"I didn't see it from the time it was in front of the Meltzer house until the collision occurred. All I saw was the light and this part striking me. I turned my back just before the car hit me. I was just about a foot this side (southeasterly) of the center."

Louis Kurth testified:

"When I got across the street, I happened to look around and I saw a big automobile just running into *Mrs. Geffert.* In my estimation, the automobile was on the east side of the center of the street, the left side going toward town. After *Mrs. Geffert* was struck by the car, she rolled down the hill. She was thrown and then she was turned over and over. I should say she was thrown perhaps five feet. The car was facing on Blair street, on the south corner facing toward Johnson street. I would say that the front wheels of the car were over the crossing toward Johnson street [meaning pointing southerly down Blair street]. The bumper came in contact with her person. When I got to East Gorham street, I looked up and down to see if there was any car coming. I was right on the crossing, on the iron plate, when I looked. I saw no car. I looked both ways. I had my child by the hand all the way over. My attention was called to the automobile when I got across on the other side of the street. I noticed a car coming along pretty fast.

He did not sound his horn. When I saw this automobile strike this woman, she was on the left side about two feet from the center of the pavement. That would be on the southeast side. At that time Mrs. Heim and my wife and the little baby were still on the crossing. They were just about a step off the iron plate on the southeast side of the street. The electric lights were burning at that time and I could see if any automobile was coming. It was not so dark but what I could see an automobile within 150 or 200 feet."

Mrs. Lottie Kurth testified:

"When we got to the iron plate on East Gorham street, *Mrs. Geffert* was right ahead of us, and the go-cart was almost pushing into her, and I looked up this way, because she warned us to look out to see that there wasn't any car coming. And I didn't see any, and I don't know what Mrs. Heim did, and I didn't see the car coming. I didn't see any car to the right of me going toward town. When I started across the street, *Mrs. Geffert* was in front of us. The go-cart was in front of Mrs. Heim and I had my right hand on that. Mrs. Heim and I were on the iron plate and *Mrs. Geffert* was ahead of us in the street. When I seen the accident I took the cart and pushed it back on the sidewalk because Mrs. Heim let go of the cart and run. I was on the iron plate when the accident happened. Mrs. Heim was along beside me when the accident happened. *Mrs. Geffert* was ahead of us and was struck about in the center of the bumper. The automobile was on the left side of the center line of Gorham street. When it struck *Mrs. Geffert*, it seems as if it just lit down, that is the first time I seen it. The driver of the automobile did not sound any horn. I do not know what became of *Mrs. Geffert* after the automobile came in contact with her because my only thought was to save the child. I know it was about six feet from the iron apron when she was struck. The automobile was not more than two or three feet from the go-cart at the time the collision occurred."

Mrs. Alma Heim testified:

"I had hold of the baby cart with both hands. Mrs. Kurth was just walking on the left side of me. *Mrs.*

*Geffert* was just about ahead of the cart, just in front of the cart. My two-year-old baby was in the cart. Just as soon as she walked up to the center the car was right on top of her. I first saw the automobile when it was right on top of her. No automobile horn sounded. There was no warning at all. I first saw the car when it was right next to *Mrs. Geffert,* right on her. I did not know what became of *Mrs. Geffert.* I screamed when I ran across the street to call the nurse. At the instant that the collision occurred, *Mrs. Geffert* was facing toward the northerly end of the crossing, the northwesterly end of the crossing. I think she seen the car. I can't tell how long she was facing in that direction. I saw her turn, and as she turned around the car struck her on this side. She simply turned half way around. She was picked up on the bumper and carried some little distance. I don't know when she fell off the bumper."

Clark M. Putnam was a disinterested witness, not a member of the party. A short time before the accident he had alighted from a car on the southeasterly side of Gorham street, intending to cross Blair street and go northeasterly along the northwesterly side of Gorham street. He testified:

"Before crossing the street I noticed a car coming from the north, from a northeasterly direction. Instead of going across there, I followed this line to the north [northeasterly] side of Blair street and then when I got across and started across on the regular crossing here, I noticed a car going southwesterly; I saw the light, and as I could make it easily, I went across and walked up the opposite side [northwesterly side] of Gorham street towards my residence. When I was about in front of the second Oakey flat, I noticed a car roll down. I just remember the car coming down and that it was going with no noise. I just remember there was a car rolling down in the usual way. Immediately after I heard a scream and when I turned around, I saw a lady dodging back and forth in front of the car, and the driver turning several ways. It was all done instantly, and then she was struck by the right front fender

and thrown off toward the west corner. I can't tell whether she was within two or three feet or how far away she was from this crossing. But, as I recollect it, she was thrown off in this direction and the car was turned off toward the south corner. The person struck was thrown towards the west corner. At the time the person was struck, I was not quite to my residence, but nearly to it. That would be seventy-five or eighty feet from the northeast line of Blair street. The letter 'F' indicates just about where I was at the time my attention was called to the scream. I heard no horn. I heard so many horns, I don't know whether that car blew the horn or not. I noticed the car first and the scream followed. I had not proceeded more than thirty feet after I noticed the car that I heard the scream. I was walking very slowly. It was warm. I couldn't give any estimate of the speed of the car when I first noticed it. I think it was going around fifteen miles per hour, that is the only thing I can say and I am not sure of that. After the person was struck, I immediately ran to assist her if possible. I found her, as near as I can remember now, she was probably lying to the northwest of the center of the intersection of Gorham street and Blair street, a little bit southwest of the light, although I can't tell exactly. When I heard this scream I turned and looked in the direction of this crossing, where this accident occurred, and I saw a woman dodging on the crossing and the course of the car changed, the man in the car changing the course of the car. It was done within a few seconds, but the lady was dodging first one way and then the other, probably he had to make two shifts, that is, changes of direction before he hit her at least. The first thing that attracted my attention when I looked, I saw this woman on this crossing. She was near the middle of the street, as nearly as I can locate it. When I first turned around the automobile was right there at the crossing. They were dodging each other, that is the way it looked to me. Her hands were up in the air and she was screaming and she was jumping from one side to the other trying to get out of the way of the car, and, of course, the driver was trying to do the same thing. I don't think there were more than two or three moves because they were close together when I looked. I believe the car stopped with the front wheels over the southwesterly side of Blair street."

O. G. Rewey, who lives on the northeasterly side of Blair street and on the southeasterly side of Gorham street on the corner, testified:

"I live where the letter 'H' is marked on the plat. I saw the accident. I was standing on our porch on the west end of the house. Some of the people I saw going on over the crossing. *Mrs. Geffert* was about midway and some of the other people not yet started to cross, as I recall it. I saw a car come down there and hit her. It threw her to the northwest. I didn't pay any attention as to where the car went. I ran over and picked her up and carried her to her home. When I first noticed this automobile coming in the direction where *Mrs. Geffert* was, I should say it was fifty to sixty feet east of the crossing. I don't recall that the car made any particular noise or if he blew the horn or anything. I cannot tell how fast the car was going. I have no way of knowing. To my recollection it threw her ten or twelve feet, that is, she rolled over. I would say that she rolled over two or three times, maybe more, after she touched the ground. To the best of my judgment she was thrown ten or twelve feet, and then rolled over two or three times. I would say that where the 'X' mark is, is about where she lay."

The defendant was called as an adverse witness and testified:

"I am twenty-two years old and graduated in 1921. After I discharged my father and mother, I drove up Gorham street and proceeded southwesterly, on East Gorham street from my father's. On going toward Blair street you go up a hill part of the way. I passed the crest of the hill on Gorham street about ten rods from the intersection of Gorham and Blount streets, then for about twenty rods the ground is level. The decline starts about ten rods from Blair street. I drove all the time at fifteen miles per hour. When I got to the decline on East Gorham street the car was in gear. I didn't release my clutch. The car as you proceed, the motor brakes the car. I shut off the gas and the engine holds the car back. I had a clear right of way. There was no moving car in front of me. As I remember it, I struck the plaintiff about four feet from the center, in

a northerly direction, probably one or two feet off the sidewalk, at the intersection of the crosswalk on North Blair street with East Gorham street. It was within the intersection. There was a contact between the plaintiff and my car. I wouldn't say that I struck her. The right front fender and the right side of the bumper of the Buick car came in contact with the plaintiff. I believe it struck *Mrs. Geffert* about in the region of her hip, and her hand was extended towards the car, and I believe that also came in contact with the machine. There is a possibility that some small portion of the left fender might have projected over the center line of East Gorham street. I brought my car to a stop at a point two or three paces from the curb, or rather from the crosswalk crossing Blair street, and three strong paces from the gutter. The whole of my car was within the intersection of North Blair street and East Gorham street and within the limits of what I choose to call the walk. At the time I came in contact with the plaintiff I would say I was going twelve miles per hour at the maximum, possibly less. I had reduced my speed to twelve miles per hour when I was twenty feet from the brick sidewalk crossing East Gorham street on the northeast side of Blair street. I first began to reduce my speed about fifty feet from the crossing. At the time I struck the plaintiff, I saw other persons on that crosswalk. There was a group of people. I saw as many as four grown-up persons and a child. I can't say where the other two persons nearest the plaintiff were. When I first saw the people on this crossing, I was less than ten rods up Gorham street, probably 150 feet. When I was 150 feet away from the crossing, I saw persons, maybe three or four feet from the southeast corner. I kept my attention upon them excepting such as was necessary to do the driving. My brakes were working all right. There was a foot-brake on my car and an emergency brake and a hand-brake. I had my foot on the service brake. I didn't attempt to stop the car. I didn't use the emergency brake at any time. I brought my car to a stop with my foot-brake. All the time while I was coming down East Gorham street, I knew those people were on the crossing and I was watching them except what attention it took to drive the car. The lights on the car were lighted. I have a horn on the car and I sounded it that night, about 150

feet away from the crosswalk where the accident happened. I took it for granted these people had ample time to cross the street and I continued under that assumption."

As a result of the collision the plaintiff sustained a fracture of two of the bones in her left foot, suffered from the accompanying shock, and was compelled to remain in bed for some time. The nature and extent of the plaintiff's injuries are not set out, as it was not deemed material by the plaintiffs upon this hearing.

The foregoing is a fairly accurate statement of the situation. There was much repetition in the testimony and it is impossible to repeat it in full. There is some testimony, particularly that given by *Mrs. Geffert* in regard to having the exact place of the accident indicated to her by some supernatural force, that bears upon the weight and credibility of her testimony. It is not repeated here because not deemed material upon the questions presented.

Upon this state of the evidence the defendant moved for a nonsuit as stated. The court met the situation with commendable courage and fairness, and the fact that we arrive at a different conclusion upon the facts in a case as close as this is no reflection upon the able trial judge, and we assume that he approached the question, as we do, with a full appreciation of judicial responsibility.

While there is little or no direct evidence to show that the defendant was driving at a rate exceeding fifteen miles per hour at or shortly preceding the accident, there are many facts and circumstances from which a jury might properly draw an inference to that effect. Defendant testified that he did not apply his brake as he approached the crossing; that he could have stopped his car within a distance of twenty feet; that he saw the group upon the crossing when he was distant 150 feet. The evidence is quite definite that the car after the accident ran forty feet. Allowing for confusion, due to the fact that an accident had happened,

it still does not appear that the car was under such control as it should have been when approaching the crossing upon which the defendant knew that there was, as he describes it, a group of people.

Sec. 1636—49, Stats., provides:

"No person shall operate or drive any automobile . . . at a rate of speed greater than is reasonable and proper, having regard to the width, traffic and use of the highways and the general and usual rules of the road, or so as to endanger the property, life or limb of any person. . . ."

Foot passengers, as well as automobiles, have a right to be in, upon, and occupy the public streets, and when pedestrians appear in groups upon a street crossing as in this case, it is the duty of an automobile driver to so operate and control his car as not to endanger the life or limb of pedestrians. Whether the defendant did so operate his automobile is under the facts and circumstances of this case clearly a question for the jury.

The question of the plaintiff's contributory negligence raises a much more difficult question and one not easy of solution. Even if it be assumed that the defendant was traveling at a rate of speed considerably in excess of fifteen miles an hour, there are many circumstances difficult of reconciliation. The plaintiff testified that she first saw the automobile when it was at a distance of 150 feet or thereabouts and says that she was then about one foot southeasterly of the center line of Gorham street, and that she next saw the car just before it struck her, and describes herself as being in exactly the same place. The witness Putnam testifies that walking slowly he proceeded twenty to thirty feet while the automobile went about eighty feet. A good deal of allowance must be made for confusion in *Mrs. Geffert's* testimony. She was thrown from five to ten feet, suffered quite severe and painful injuries, and no doubt her recollection of the details of the occurrence is

not clear.  Both Mrs. Heim and Mrs.. Kurth testified that they did not see the car at all until just before it struck *Mrs. Geffert*.  *Mrs. Geffert* testifies that she was immediately behind Mr.. Kurth and the little girl.  The undisputed testimony is that they had crossed the street, were on the iron apron on the northwesterly side of the street.  Mr. Kurth·turned around, and as he turned around he saw the automobile strike *Mrs. Geffert*.  He says that when he entered upon the street crossing from the southeasterly side he looked up East Gorham street and saw no car coming, and says that she was on the east side (meaning southeasterly) of the center of the street.  That is the point where she says she looked for the car and it was distant 150 feet. *Mrs. Geffert* testifies that she looked up and down the street before she entered upon the crossing, and if she means by the statement, "I was just this side of half of the street toward my home," that she was on the southeasterly side of the southeasterly half of the street, her testimony would accord with that of all the witnesses who saw the car, which was to the effect that at that time it must have been at least 150 feet east of the crossing.  Upon her adverse examination before trial she indicated, by marking upon a ·diagram, that she had crossed the center of the street and was about halfway between the center and the curb line when she was struck, but upon the trial she attempted to correct that statement, and it was in that connection that she testified that some occult power had indicated to her the exact place of the happening of the accident.

The case of *Brickell v. Trecker*, 176 Wis. 557, 186 N. W. 593, has no application to the facts in this case. Here the plaintiff testifies that she did look both before entering upon the street and when she was midway in her attempt to cross the street.  While the evidence tends to show that had *Mrs. Geffert* proceeded at an ordinary rate

of speed across the street she would have escaped injury, and while she offers no explanation as to the length of time it took her to reach the point where she was injured, she is not required to do so if she was in the exercise of due care.  The circumstances are such that we cannot say that "the minds of reasonable men can come to but one conclusion upon the law, facts, and circumstances in this case." It must be borne in mind that we are not dealing here with the great weight or preponderance of the evidence, but with the question of whether or not the contributory negligence of *Mrs. Geffert* is conclusively established as a matter of law.  *Friedrich v. Boulton,* 164 Wis. 526, 159 N. W. 803.

In order to charge *Mrs. Geffert* with negligence as a matter of law, it is necessary to settle certain facts which are in dispute and to make inferences as to which reasonable men may well differ.  We give due weight to the ruling of the trial court in reaching our conclusion.  But the advantage which the trial court has is largely in matters which relate to credibility and weight of the testimony, and were that the question here, the ruling of the trial court could not be disturbed under well established rules.  But upon the whole case the minds of reasonable men may well come to different conclusions as to plaintiff's negligence, and in that situation the question is one for the jury.  *Mrs. Geffert* does not explain why she remained upon the crossing so long a time, but the length of time she was there is not conclusively established, and one need not go at top speed across a street even in the presence of an approaching automobile.  Pedestrians may be upon the streets lawfully, and the mere fact that one does not proceed at a particular speed does not as a matter of law establish negligence on his part.

*By the Court.*—As to the defendant *Paul Kayser* the judgment is reversed and the cause remanded for a new trial; as to the defendant *Adolph H. Kayser* the judgment

is affirmed.   No costs to be taxed for printing briefs of either party.   Plaintiff to recover his taxable costs for printing case, clerk's fees, and transcript.

VINJE, C. J. (*dissenting*).   I reach the conclusion that a normal adult, with nothing to distract her attention or detain her, who sees a car coming towards her at a distance of 150 feet when she is either entering upon the paved portion of a street thirty-two feet wide between the curbs, or is within a few feet from the center thereof, and who pays no further attention to the car until she is struck by it near the center of the street, is guilty of contributory negligence as a matter of law.   *Mrs. Geffert* gives no explanation why she did not again look for the car after she first saw it coming towards her at a distance of 150 feet until it struck her. Had she proceeded on her way from the iron apron at the curb at a moderate walk, she as well as Mr. Kurth and his daughter would have been safely across the street, for they all started from the iron apron at the same time.   She gives no reason why she loitered on the street without again looking towards the car that she knew was coming, as she says, at a great rate of speed.   That its speed was not very great is evidenced by the fact that the others safely crossed the street while the car traveled less than 150 feet; that it stopped on quite a steep down grade within forty feet of where she was struck, and by other undisputed evidence in the case.   I think the trial court was justified in finding her guilty of contributory negligence as a matter of law.

I am authorized to state that Mr. Justice ESCHWEILER and Mr. Justice JONES concur in this dissent.